ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | |
| v. | NO. | 3-20CR0384-N |
| VINSON WOODLEE (01) | | |

### INDICTMENT

The Grand Jury Charges:

### Introduction

1. Physicians, marketers, pharmacists, and health care executives understand that pharmacies and their associated business entities cannot legally pay kickbacks for prescriptions fillable at those pharmacies and related business entities. These same individuals also understand that kickbacks for prescriptions paid for by federal insurance providers are subject to heightened scrutiny from law enforcement.

### The Anti-Kickback Statute (AKS) 42 U.S.C. § 1320a-7b(b)

2. The Anti-Kickback Statute's main purpose is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

Next Health

3.  Next Health was a holding company for a hierarchical structure of corporations and other entities that owned and controlled numerous other entities including pharmacies and laboratories that operated in the health care industry. Next Health previously operated as Business Partners in Health and later as Critical Healthcare Management. References to Next Health herein include all of these entities as well as all of their dozens of associated business entities. This includes Next Health's pharmacies, The Apothecary Shop among others, and their related "parent" company, Pharma Holdings US (PHUS). Next Health began operations in or about 2012.

4.  Next Health was principally controlled by Andrew Hillman and Semyon Narosov. Through various entities, Hillman and Narosov owned a majority of Next Health at one point in time, but regardless of their actual ownership interest or official positions within Next Health, Hillman and Narosov controlled and directed the activities of Next Health until at least July 2018.

5.  Next Health's pharmacy operations identified the most profitable prescription medications (i.e. lowest available wholesale cost with highest available reimbursement rates from private and government insurance providers) and then illegally paid physicians and others in exchange for those medications being prescribed through Next Health pharmacies. These very profitable prescriptions included compounding pain and scar creams, pain patches, wellness supplements, etc.

6. Generally, Next Health tracked each prescription by the prescribing physician, and, if relevant, the marketer who recruited the physician. In most instances, private or government insurance providers paid monies to Next Health for filled prescriptions directly or through pharmacy benefit managers (PBMs). Next Health would then calculate the net profits (sometimes referred to as profits or net proceeds) for these prescriptions and illegally kickback a percentage of the profits to the prescribing physicians.

7. To disguise and conceal these illegal kickbacks, Next Health did not pay the physicians directly. Instead, Next Health funneled the kickbacks into "syndicated" Class A or Class G pharmacies owned by physician "investors" or paid them to marketers, who in turn, paid some of the proceeds to physicians. In many instances, Next Health paid marketers a kickback equal to 50% of the profit on each prescription prescribed by the physicians they recruited.

8. From 2012 to 2018, this illegal kickback scheme resulted in Next Health billing private and government insurance programs over $700 million dollars and collecting hundreds of millions of dollars in tainted proceeds.

### Vinson Woodlee

9. **Vinson Woodlee** and his company, Med Left, LLC, acted as marketer for Next Health. Generally speaking, **Woodlee** would cause physicians to send prescriptions to Next Health pharmacies. The pharmacies would then fill the prescriptions and

illegally kickback a portion of the profits from each prescription to **Woodlee**. Next Health tracked each individual prescription and refill by both doctor and profit. After deducting a cost of goods sold (COGS) for each individual prescription, Next Health would take the amount received from the private or federal government insurance program and give **Woodlee** up to 60% of the profits.

10. **Woodlee**, in addition to Med Left, LLC, also operated a number of purported managed service organizations (MSOs). Despite their name, these entities did not provide any services and were instead used by **Woodlee** to conceal kickbacks that he paid to doctors as described above. "Med Left" when used in this indictment means Med Left, LLC and approximately 73 other MSOs that were owned and operated by **Woodlee** or Woodlee family members (also referred to sometimes as the Med Left entities). During the course of the conspiracy described below, **Woodlee** operated as Next Health's biggest marketer and Next Health paid **Woodlee**, Med Left, or known Woodlee family members over $60 million in illegal kickbacks. According to **Woodlee**, far from providing services, "an MSO is simply a model that allows physicians to share in revenue."

11. From the over $60 million that **Woodlee**/Med Left received from Next Health, approximately $16.8 million was paid to a number of physicians or physician groups and $30.6 million was paid to sub-marketers that likely further sub-divided those funds and paid a portion of them to physicians for prescriptions written by them that had

been filled at Next Health pharmacies.

## Federal Health Care Programs

12. The Medicare Program ("Medicare") was a federally funded health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f). Next Health pharmacies, primarily The Apothecary Shop, filled prescriptions for Medicare beneficiaries. Medicare paid Next Health over $30 million on prescriptions filled at Next Health pharmacies.

13. TRICARE was a health care program of the United States Department of Defense Military Health System that provided coverage for DoD beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their dependents, and survivors. TRICARE was a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f). Next Health pharmacies, primarily The Apothecary Shop, filled prescriptions for TRICARE beneficiaries. TRICARE paid Next Health over $9 million on prescriptions filled at Next Health pharmacies.

14. CHAMPVA is a health care benefit program that offers insurance coverage, including prescription drug coverage, to family members of veterans who do not qualify for TRICARE. Individuals who qualify for CHAMPVA are also referred to as "beneficiaries." CHAMPVA was a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f). Next Health pharmacies, primarily The Apothecary Shop, filled

prescriptions for CHAMPVA beneficiaries. CHAMPVA paid Next Health over $1 million on prescriptions filled at Next Health pharmacies.

15. The Federal Employee Compensation Act ("FECA") was a federally funded health care program as described in 20 C.F.R. § 10.0 that provided monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States government, including Postal Service employees, for disability due to personal injury or disease sustained while in the performance of duty. FECA was a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f). Next Health pharmacies, primarily The Apothecary Shop, filled prescriptions for FECA beneficiaries. FECA paid Next Health over $8 million on prescriptions filled at Next Health pharmacies.

[Nothing follows on this page]

## Count One
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)))

The grand jury re-alleges and incorporates by reference all preceding paragraphs of this Indictment as if fully set forth herein.

16. From in or about January 2012 through in or about July 2018, the exact dates being unknown to the grand jury, in the Northern District of Texas and elsewhere, defendant **Vinson Woodlee** knowingly and willfully conspired, confederated, and agreed with others known and unknown to the Grand Jury, to commit offenses against the United States, that is, violations of Title 42, United States Code, Sections 1320a-7b(b)(1), by knowingly and willfully asking for and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, for the furnishing of items and services, namely prescriptions, for which payment may be made in whole or in part under a Federal health care program.

**PURPOSE AND OBJECT OF THE CONSPIRACY**

17. It was a purpose and object of the conspiracy for **Vinson Woodlee** and other co-conspirators to unlawfully enrich themselves through the payment, solicitation and receipt of bribes and kickbacks from Next Health in exchange for referring prescriptions for items and services for which payment was made in whole or in part under a Federal health care program, including TRICARE, CHAMPVA, Medicare, and FECA.

## MANNER AND MEANS OF THE CONSPIRACY

18. Pursuant to his agreement with Next Health, **Woodlee** was generally paid as a kickback 50% of net profits on prescriptions written by "his" doctors and filled at Next Health pharmacies. **Woodlee** then paid kickbacks to physicians directly, or indirectly through various MSOs, or through sub-marketers.

19. Since **Woodlee** and his coconspirators knew that it violated the Federal Anti-Kickback Statute (AKS) for Next Health to pay **Woodlee** for the prescriptions of federal beneficiaries, and that such payments would subject the coconspirators to heightened scrutiny, **Woodlee** and his co-conspirators engaged in at least three schemes to disguise, conceal, and cover up illegal payments for federal prescriptions. Because **Woodlee** and the conspirators knew that bona fide—*i.e.*, real or legitimate—employees were an exception to the AKS, the coconspirators initially paid **Woodlee** for "Federal health care program" prescriptions, sometimes referred to as federal business, through fictitious W-2 wages paid by a Next Health subsidiary. This occurred from at least sometime in 2013 through the end of 2014. During this timeframe **Woodlee** was paid a salary and quarterly "bonuses" for his federal business.

20. Beginning in or about December 2014, **Woodlee's** coconspirators, to further conceal the illegal kickbacks, paid him for "Federal health care program" prescriptions via fictitious W-2 wages to his family members. For purposes of this indictment, these family members will be referred to as Person A, Person B and Person

Indictment - Page 8 of 19

C. From January of 2015 through February 2016, **Woodlee** received the majority of his kickback in the form of monthly bonuses to Person A. These bonuses were based solely on profits generated from federal prescriptions. The sham or fictitious W-2 positions at Next Health for Person A, Person B, and Person C were "eliminated" on October 7, 2017.

21. Finally, beginning around March of 2016, through the end of the conspiracy, **Woodlee** received illegal kickbacks for the prescriptions of federal beneficiaries via Next Health increasing the percentage of profit he received from prescriptions for patients with private insurance benefits written by "non-invested" physicians. As mentioned, Next Health typically paid marketers a kickback equal to 50% of the profit on each prescription, but excluded federal beneficiaries from this deal to avoid scrutiny. In an effort to hide the fact that **Woodlee** was nonetheless being paid for federal business, Next Health increased **Woodlee's** share of the profit for prescriptions paid for by private insurance companies from 50% to 58%.

## OVERT ACTS

22. In furtherance of the conspiracy, and to accomplish its object and purposes, **Vinson Woodlee** and other coconspirators committed and caused to be committed, in the Northern District of Texas and elsewhere, the following overt acts, among others:

23. On or about March 1, 2014, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $12,639.29.

24. On or about June 1, 2014, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $22,914.29.

25. On or about September 1, 2014, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $37,493.96.

26. In November of 2014, **Woodlee** and other conspirators agreed to stop paying Woodlee for federal business under the auspice of an employment relationship. Instead, Person A, Person B, and Person C were "hired" as account executives by Next Health. Next Health then paid **Woodlee** commissions on federal prescriptions in violation of the AKS through monthly salaries for these three individuals and through a monthly bonus to Person A.

27. On or about December 1, 2014, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs for the months of October and November of 2014 at approximately $161,806.14.

28. On or about January 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs for the prior month at approximately $147,488.96.

29. On or about February 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at

approximately $161,188.19.

30. On or about March 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $159,557.33.

31. On or about April 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $237,761.38.

32. On April 13, 2015, **Woodlee** sent an email to Next Health reminding them to get Person A's "F. report" in.

33. On or about May 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $215,907.93.

34. On or about May 20, 2015, **Woodlee,** on behalf of Med Left, executed a compounded pharmaceuticals and prescription medications marketing commission contract with Next Health, LLC.  The term of the agreement was for 18 months.  In addition to other contract provisions, **Woodlee** initialed the following provision of the contract:

> **Contractor will not receive compensation for any federally funded insurance prescription.**

The contract further stated, "[f]ederally funded insurance includes but is not limited to Medicare, Medicaid, Medicare Advantage plans, Federal workers compensation and any

claim with a federally funded program as a secondary insurer."

35. On or about June 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $85,941.74.

36. On June 26, 2015, **Woodlee** emailed Person B and copied Next Health. In the email, **Woodlee** sought an updated breakdown on the recent bonus paid to Person A. The subject line of the email is "Re: federal."

37. On or about July 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $55,153.88.

38. On or about August 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $57,155.09.

39. Between August 18 and August 21, 2015, **Woodlee,** Person B, and Person C engaged in a series of emails with Next Heath in relation to the Apothecary July report and specifically inquired about a known physician's "federal scripts" that they wanted payment for.

40. On or about September 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $142,578.07.

41. On September 18, 2015, **Woodlee** emailed Next Health with a list of federal prescriptions written by a known physician that had been left off of [Person A's] August bonus report related to federal prescriptions.

42. On or about October 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $111,748.07.

43. On or about November 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $208,663.26.

44. On or about December 1, 2015, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $88,818.01.

45. On or about January 1, 2016, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $150,845.38.

46. On or about January 7, 2016, **Woodlee** on behalf of Med Left, LLC, executed a pharmacy marketing commission contract with Next Health, LLC, effective December 2, 2015 for a term of 18 months. In addition to other contract provisions, **Woodlee** initialed the following provision of the contract:

> **In no case shall Independent Contractor receive compensation or remuneration for any samples or any other business generated**

**regarding or from federally funded program/insurance.**

The contract further stated, "[f]ederally funded insurance includes but is not limited to Medicare, Medicaid, Medicare Advantage plans, Federal workers compensation, VA, Tri-Care, BCBS Federal, Storm, Medi-Cal, Black Lung, Champus and any claim with a federally funded program as a secondary insurer."

47. On or about February 1, 2016, Next Health calculated **Woodlee's** share of the profits earned from prescriptions paid for by federal programs the prior month at approximately $150,624.46.

48. On or about March 1, 2016, Next Health calculated the profits from approximately 282 prescriptions paid for by federal insurance programs during the prior month. As in the other months, the profits of nearly $300,000 were then split between Next Health and **Woodlee**.

49. On or about March 24, 2016, **Woodlee** on behalf of Med Left, LLC executed another pharmacy marketing commission contract with Next Health, LLC, effective March 1, 2016. Among other terms, Next Health agreed to pay **Woodlee** a 58% commission on non-federal prescriptions written by "non-invested" physicians and filled at Next Health pharmacies. Despite the fact that **Woodlee's** commission was being raised from 50% to 58% in order to compensate him for federal prescriptions in violation of the AKS, **Woodlee** initialed the following provision of the contract:

> **In no case shall Independent Contractor receive compensation or remuneration for any samples or any other business generated**

**regarding or from federally funded program/insurance.**

The contract further stated that, "[f]ederally funded insurance includes but is not limited to Medicare, Medicaid, Medicare Advantage plans, Federal workers compensation, VA, Tri-Care, BCBS Federal, Storm, Medi-Cal, Black Lung, Champus and any claim with a federally funded program as a secondary insurer."

50. On or about July 1, 2016, Next Health calculated **Woodlee's** 58% share of profits on prescriptions written by "non-invested physicians" and filled by Next Health pharmacies the prior month at $996,937.00. This kickback violated the AKS.

51. On or about July 15, 2017, Next Health paid **Woodlee** approximately $278,023.27 which represented a 58% commission on profits from prescriptions written by "non-invested physicians" and filled by Next Health pharmacies in June of 2017. This kickback violated the AKS.

52. On or about November 15, 2017, Next Health paid **Woodlee** approximately $81,331.29 which represented a 58% commission on profits from prescriptions written by "non-invested" physicians and filled by Next Health pharmacies in October of 2017. This kickback violated the AKS.

53. On or about January 15, 2018, Next Health paid Woodlee approximately $14,715.13 which represented a 58% commission on profits from prescriptions written by "non-invested physicians" and filled by Next Health pharmacies in December of 2017. This kickback violated the AKS.

54. **Woodlee** or other co-conspirators committed the overt acts as set forth in Counts Two through Four of this Indictment, which are incorporated by reference as if set forth fully in this Count.

All in violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)).

## Counts Two through Four
### Asking for and Receiving Health Care Kickbacks and Aiding and Abetting
(Violations of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2)

55. The grand jury re-alleges and all preceding paragraphs of this Indictment as if fully set forth herein.

56. On or about the dates set forth below, in the Dallas Division of the Northern District of Texas and elsewhere, **Vinson Woodlee**, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully solicit and receive remuneration, as described below, directly and indirectly, overtly and covertly, in cash and in kind from Next Health in return for referring prescriptions to Next Health, for which payment was made in whole and in part under a Federal Health Care Program, each kickback forming a separate count of this Indictment:

| Count | Date of Payment | Amount of Payment |
|---|---|---|
| 2 | October 16, 2015 | $62,021.85 |
| 3 | November 13, 2015 | $132,767.58 |
| 4 | December 11, 2015 | $44,674.21 |

Each in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2.

## Forfeiture Notice
(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c))

57. Upon conviction of any of the offenses alleged in Counts One through Four of this Indictment, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(7) in conjunction with 28 U.S.C. § 2461(c), **Vinson Woodlee** shall forfeit to the United States of America all property constituting or derived from proceeds traceable to the respective offense, including a "money judgment" in the amount of U.S. currency constituting the proceeds traceable to the respective offense.

58. Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendant (1) cannot be located upon the exercise of due diligence; (2) has been transferred or sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value; or (5) has been commingled with other property which cannot be divided without difficulty, the United States will seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

[Nothing follows on this page]

A TRUE BILL.

_____
FOREPERSON

PRERAK SHAH
ATTORNEY FOR THE UNITED STATES
Acting Under Authority Conferred by 28 U.S.C. § 515

*Chad E. Meacham*
_____
CHAD E. MEACHAM
Assistant United States Attorney
Texas Bar No. 00784584
Email: chad.meacham@usdoj.gov
ANDREW O. WIRMANI
Assistant United States Attorney
Texas Bar No. 24052287
Email: andrew.wirmani@usdoj.gov
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Tel: (214) 659-8600
Fax: (214) 659-8809

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

VINSON WOODLEE (01)

INDICTMENT

18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)
Conspiracy to Pay and Receive Health Care Kickbacks
(Count 1)

42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2
Asking for and Receiving Health Care Kickbacks and Aiding and Abetting
(Counts 2 through 4)

18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c)
Forfeiture Notice

4 Counts

A true bill rendered

_____
DALLAS                                                          FOREPERSON

Filed in open court this 19 day of August, 2020.

_____

**Summons to Issue**

_____

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending